UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 02-23306-CIV-SEITZ/BANDSTRA

TIGERDIRECT, INC.                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
WHENU.COM, INC.,                     )
                                     )
            Defendant.               )
_____    )

NIGHT BOX
FILED

APR 8 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

Jane W. Moscowitz, Esq.
Moscowitz Moscowitz & Magolnick, P.A.
Mellon Financial Center
1111 Brickell Avenue, Suite 2050
Miami, FL 33131
Telephone (305) 379-8300
Facsimile (305) 379-4404

**Of Counsel**

Nels T. Lippert, Esq.
Dyan Finguera-DuCharme. Esq.
Jennifer A. Gaeta, Esq.
Hale and Dorr LLP
300 Park Avenue
New York, New York 10022

Arnold P. Lusker, Esq.
Carl H. Settlemeyer III, Esq.
Maureen Cohn Harrington, Esq.
Lutzker & Lutzker LLP
1000 Vermont Avenue, N.W., Suite 430
Washington, D.C. 20005



## PRELIMINARY STATEMENT

TigerDirect, Inc. ("Tiger") comes before this Court with a slew of misrepresentations about WhenU.com, Inc. ("WhenU") and asks this Court to enjoin WhenU from offering the very same sort of contextual advertising used by Tiger itself, only last year, when it thought it competitively advantageous to do so. WhenU is proud of the competition-enhancing advertising its ads and coupons provide, and is confident that it will vindicate its business practices at trial. But to facilitate the efficient resolution of this matter, when Tiger filed its Complaint, WhenU voluntarily altered its technology to prevent WhenU ads and coupons from appearing on a consumer's computer screen when the WhenU technology discerns that the consumer is viewing Tiger's website. Tiger is well aware of this change in WhenU's operations.

Because WhenU affirmatively acted to prevent visitors to the Tiger website from seeing WhenU ads and coupons, Tiger will not suffer any harm, let alone irreparable harm, if this Court determines that it should not enjoin WhenU from showing any offers it is not showing anyway. Moreover, Tiger bases its motion on allegations so inaccurate that, viewed most charitably, evidence a total failure to conduct even rudimentary investigation into how WhenU's technology operates before asking this Court to enjoin its operation.

This Court should also deny the motion on the basis of Tiger's unclean hands. Just last year, some two months after Tiger claims to have discovered the advertising practices it calls "online advertising thievery" and seeks to enjoin, Tiger engaged the services of The Gator Corporation ("Gator"), WhenU's largest competitor, for the very same type of advertising. Tiger engaged Gator to run a contextual ad campaign on its behalf on two separate occasions. As part of that campaign, Tiger arranged for its own pop-up ads to appear on consumers' computer screens, via Gator software, when consumers viewed the websites of Dell Computer or other Tiger competitors. Now, Tiger comes before this Court requesting the extraordinary remedy of an injunction because ads for Dell Computer and other competitors were occasionally delivered via WhenU software when consumers were viewing the TigerDirect website. Tiger's hypocrisy should not be rewarded with the equitable relief it seeks.

Tiger's sudden quest for an injunction that it does not need, seeking to bar conduct that is not occurring and in which Tiger itself also engaged, stands in sharp contrast to its delay in bringing this

action in the first place. Tiger waited some eight months after it claims to have discovered WhenU's advertising services before filing this action. And it has waited another four months before requesting any injunctive relief. WhenU's advertising presents no imminent risk to Tiger, and its undue delay bars preliminary injunctive relief.

Each of these reasons is alone sufficient grounds for denying the requested extraordinary remedy. But that's really only the beginning: even more fundamentally, the legal theories on which Tiger predicates it motion for preliminary injunction are fatally flawed. There is nothing unlawful about WhenU's advertising activities, making it impossible for Tiger to establish the likelihood of success on the merits required for a preliminary injunction.

## STATEMENT OF FACTS

### I. Tiger Distorts and Misrepresents Basic Facts to the Court.

Tiger wholly misrepresents WhenU's business practices and the functionality of its software. WhenU makes software that displays relevant ads and coupons to consumers, in response to the activity of a consumer taking place in an open Internet browser window on that consumer's computer screen. (Naider Aff. ¶¶ 8.) WhenU's offers are displayed in a separate WhenU-branded window and may appear in front of, to the side of, or behind the main Internet browser window. (Naider Aff. ¶¶ 8.)

The following notes just a few of the inaccurate statements of fact proffered by Tiger:

| Misrepresentation | Fact |
|---|---|
| The SaveNow software under the guise of giving consumers valuable coupons hides additional advertising software which remains "permanently embedded in the PC" when the user uninstalls SaveNow. (Tiger Mem. at 11.) | The SaveNow software displays coupon codes and contextual advertisements. It is a single piece of software that is easily uninstalled, which ceases to operate and show ads once uninstalled. (Naider Aff. ¶¶¶¶ 22, 34, 35, 36.) |
| WhenU "deceptively misleads consumers into the false perception that the pop-up advertisements appear with the Plaintiff's authorization and approval." (Id. at 12.) | WhenU's ads and coupons all contain an explicit notice that they are not affiliated with or sponsored by the website the consumer is currently viewing. (Naider Aff. ¶¶ 42.) |
| WhenU's software is a "Trojan horse" that | WhenU enforces a rigorous privacy policy that |

| | |
|---|---|
| "pirates" information about users and follows the "cookies" of consumers. (Id. at 2, 8.) | exceeds industry standards. Its software does not assemble user profiles, does not use cookies, and does not steal or transmit data about the consumer. (Naider Aff. ¶¶¶¶ 38-39.) |
| WhenU's ads obfuscate the content of websites and change their display. (Id. at 9.) | WhenU's ads do not obfuscate website content in any way. Even when they appear in front of an open browser window, clicking on the browser makes them automatically recede to the background. (Naider Aff. ¶¶ 47.) |
| WhenU "banner advertisements cannot be removed at all"; and "it takes a series of steps" to close a SaveNow ad, "which may take several attempts." (Id. at 10.) | Like any other window in the Windows operating environment, all of WhenU's ads are easily closed with one step: clicking a prominent "x" in the corner of the ad. (Naider Aff. ¶¶ 46.) |
| WhenU "does not sufficiently notify" consumers about the functionality of the software. (Id. at 9, 11.) | Each installation of the software is clearly disclosed and contains a clear explanation of functionality. (Naider Aff. ¶¶ 34, Exs. F - G.) Moreover, each ad contains a clear explanation of the SaveNow service. (Naider Aff. ¶¶ 42.) |

Such gross misstatements pervade Tiger's brief.

## II. WhenU's Marketing Technology Is An Evolution Of Well-Established Marketing Techniques.

WhenU's SaveNow software shows consumers ads and coupons that it determines are likely to be of interest to them based on what those consumers are searching for or looking at on the Internet. WhenU fosters online competition by presenting consumers with choices; it does not deceive consumers. Recognizing that advertising is most successful when it is relevant to consumers, retailers have long sought ways to communicate with consumers who have exhibited an interest in their products or services; this technique is known as "contextual marketing." (Naider Aff. ¶¶¶¶ 16-17.) While such practices typically have relied on information about consumers' past purchases to predict future behavior, WhenU's founders sought to use the unique

4

capabilities of the Internet to evolve "contextual marketing" to a more useful level, with a proprietary software product named SaveNow that displays ads and coupons to consumers while they are researching a product or service online. (Naider Aff. ¶¶¶¶ 17-22.)

The mechanism by which the SaveNow software displays relevant ads is a proprietary directory of the Internet. (Naider Aff. ¶¶¶¶ 24-25.) Using available market research, WhenU researchers sort commonly used search phrases, commonly visited web addresses, and various "keyword algorithms" into different categories, stored in the directory.[1] (Naider Aff. ¶¶ 25.) When a consumer installs the SaveNow software, the WhenU directory is delivered to and saved on that consumer's desktop. (Naider Aff. ¶¶ 24.) When that consumer later browses the Internet, the software scans the search terms, web addresses, and page content that the consumer accesses to determine whether they match the information in the directory. (Naider Aff. ¶¶ 26.) If the SaveNow software finds a match, it identifies the associated product or service category and displays an ad appropriate for that category. (Naider Aff. ¶¶¶¶ 26-27.)

WhenU sells advertising to advertisers on a category-basis. WhenU does not offer advertisers the ability to target individual websites and makes no guarantee to advertisers that their ads will appear when consumers browse to a particular website. (Naider Aff. ¶¶ 30.) It guarantees only that ads will be shown to consumers interested in a particular category. (Naider Aff. ¶¶ 30.)

**III.  SaveNow Is Disclosed To and Affirmatively Accepted By Consumers.**

Although WhenU's SaveNow software is typically installed on consumers' computers as part of a "bundle" of other software applications,[2] consumers always receive a notice stating that

_____

[1]The WhenU directory contains more than 40,000 search phrases, web addresses, and keyword algorithms, which are organized into more than 500 product or service categories. (Naider Aff. ¶¶ 25.) WhenU's researchers are continuously updating this directory. (Naider Aff. ¶¶ 24.)

[2] Developers of such free software applications, called "freeware," rely on the revenue generated by WhenU's advertising software to enable them to continue to offer their software free of charge. (Naider Aff. ¶¶ 33.) Although the SaveNow software is bundled with freeware, it is in no way a "Trojan horse". (Naider Aff. ¶¶ 37.) This term is used to describe software that appears harmless, but once loaded onto a consumer's computer, operates differently than its stated functionality, such as by stealing or transmitting personal data about the consumer and his or her browsing habits. (Naider Aff. ¶¶ 37.) In contrast, SaveNow, which does not steal or transmit any

SaveNow is part of the download. (Naider Aff. ¶¶¶¶ 33-34, Exs. F - G.) To install SaveNow, the user must affirmatively accept a separate SaveNow license agreement that explicitly explains what SaveNow is and how it operates and that it shows offers. (Naider Aff. ¶¶ 34, Ex. G.) If a consumer no longer wants to use the SaveNow software, he or she can easily uninstall the program in the standard manner that software is typically uninstalled. (Naider Aff. ¶¶ 36.)

After installing the software, whenever an ad or coupon is shown, it appears in a distinct, separate window that has no physical relationship to any webpage that also may be visible in a browser window open on a computer user's desktop. (Naider Aff. ¶¶ 40.) WhenU's ads and coupons do not appear "on" Tiger's website and WhenU does not sell advertising space "on" Tiger's website. (Tiger Mem. at 8; Naider Aff. ¶¶ 43.)

In most cases, WhenU ads and coupons are clearly branded with a bright neon green "$" symbol in the corner of the WhenU window as well as the "SaveNow" designation. (Naider Aff. ¶¶ 42.) In some cases, WhenU ads and coupons are branded with a bull's eye and the designation "Save!". (Naider Aff. ¶¶ 42.) All SaveNow ads and coupons also contain a prominent notice stating: "This is a WhenU offer and is not sponsored or displayed by the websites you are visiting. More...,". (Naider Aff. ¶¶ 42, Ex. M.) WhenU has used this notice since December 2002,[3] and includes it on all SaveNow ads and coupons. (Naider Aff. ¶¶ 42.) Clicking on "More..." opens a new window that contains a thorough explanation of the SaveNow software and a direct link to a page with even more detailed information and easy instructions for uninstalling the software. (Naider Aff. ¶¶ 42, Ex. N.)

If a consumer does not want to see the WhenU ad or coupon, he or she can easily close it by clicking the prominent "X" in the corner of the WhenU window. (Naider Aff. ¶¶ 46.) Clicking on an "X" to close a window is a simple action, familiar to all consumers who use Windows-based

---

personal data, clearly discloses its presence and purpose, both during the initial download and installation and whenever it displays an offer. (Naider Aff. ¶¶ 37.)

[3] Prior to December 2002, WhenU's notice stated: "A WhenU.com offer - click ? for info." (Naider Aff. ¶¶ 42 n.2.) Clicking on the "?" opened a separate box. The box contained the same disclosure that is included in the box today, which thoroughly explains that WhenU's offers are not sponsored by or affiliated with any website that a consumer is viewing. (Naider Aff. ¶¶ 42 n.2.)

computers. (Naider Aff. ¶¶ 46.)

## IV. WhenU Stopped The Complained of Activities.

WhenU never received the cease and desist letter from Tiger ostensibly sent to WhenU in October 2002. (Naider Aff. ¶¶ 54.) To expedite resolution while minimizing costs and resources, soon after the Complaint was filed, WhenU altered its technology so that WhenU offers would be prevented from being displayed if the WhenU technology discerned that a consumer was simultaneously accessing Tiger's website in an open Internet browser window. (Naider Aff. ¶¶ 55.)

Despite WhenU's assurances and compliance, and despite the absolute absence of complained of action, Tiger filed a motion for preliminary injunction because WhenU was unwilling to enter into an Order of injunction. (Tiger's Mem. at 3.) While WhenU has every intention of not displaying the complained of offers during the pendency of this litigation, under no circumstances will WhenU voluntarily enter into an Order of injunction, which by its very nature would call into doubt the legality of WhenU's proprietary software. (Naider Aff. ¶¶ 56.)

## V. Tiger Itself Has Used the Complained of Online Contextual Advertising.

The Complaint alleges that WhenU's advertising practices are unlawful and constitute "online advertising thievery." (Compl. at ¶¶ 31.) It is remarkable that Tiger asserts these claims despite its unequivocal use of very similar contextual advertising when it found it convenient to do so. Last year, Tiger engaged the services of Gator, WhenU's biggest competitor. (Affidavit of Jennifer A. Gaeta, Esq. ("Gaeta Aff."), Ex. A.) Tiger contracted with Gator, not once but twice, for an advertising campaign using pop-up ads to be displayed when consumers accessed more than 100 computer and technology websites, including Dell.com. (Gaeta Aff. Ex. A.) Indeed, in an e-mail from Lonny Paul, Tiger's Director of eCommerce (the same employee submitting an affidavit in support of the instant motion), Mr. Paul explained that Tiger's ad campaign needed to be "aggressive" because:

> Keep in mind, this will be popping up on other tech sites. customers are looking to
> buy. we need to give them a big reason (besides discounts) - on why they are

gonna click.

(Gaeta Aff. Ex. A.) Tiger entered into the second contract with Gator in May 2002, two months after it claims to have discovered WhenU's ads and just six months before filing its lawsuit against WhenU. (Gaeta Aff. Ex. A.) Tiger apparently only stopped this ad campaign because Gator would not agree to suppress competitive ads from appearing when consumers accessed Tiger's website. (Gaeta Aff. Ex. A.)

**VI. An Injunction Would Cause Irreparable Harm to WhenU.**

The SaveNow system is a forward step toward an Internet marketplace that creates greater access to information, ultimately benefiting consumers and the economy by increasing competition and choice. (Naider Aff. ¶¶ 49.) WhenU's entire business model revolves around the ability of its software to display contextually relevant ads for its clients. (Naider Aff. ¶¶ 50.) When creating this novel form of advertising, WhenU's founders sought to provide consumers with relevant options when they purchase products or services online, while rigorously protecting consumer privacy. (Naider Aff. ¶¶ 50.)

In its relatively short history, WhenU has fostered advertising relationships with over four hundred online advertisers including Priceline, British Airways, Delta Airlines, American Express, Bank of America, Ford and General Motors. (Naider Aff. ¶¶ 51.) The entry of a preliminary injunction is a signal to the marketplace that will undoubtedly threaten many existing WhenU relationships and disrupt its ability to obtain new advertisers. (Naider Aff. ¶¶ 51.)

In fact, three of its large advertisers, American Express, Bank of America and General Motors, discontinued their campaigns with WhenU out of concern that further use of WhenU's advertising services would embroil them in litigation such as this. (Naider Aff. ¶¶ 52.) Several other current advertisers have expressed fear about negative publicity associated with potential litigations or injunctions. (Naider Aff. ¶¶ 52.) If an injunction is granted against WhenU, there is no doubt that a rapid exodus of advertisers will take place. (Naider Aff. ¶¶ 52.)

## ARGUMENT

A preliminary injunction is a "drastic remedy," *Michael Caruso & Co., Inc. v. Estefan*

*Enters., Inc.*, 994 F. Supp. 1454, 1458 (S.D. Fla. 1998), aff'd, 166 F.3d 353 (11th Cir. 1998), and not appropriate here because Tiger cannot make a clear showing that (1) it will suffer irreparable harm, (2) the balance of harms weighs in its favor, (3) it has a likelihood of success on the merits, or (4) an injunction would serve the public interest. *American Red Cross v. Palm Beach Blood Bank*, 143 F.3d 1407, 1410 (11th Cir. 1998).

## VII. Tiger Is Not Entitled to Equitable Relief.

### A. Tiger's Unclean Hands Should Prevent Entry of a Preliminary Injunction.

The Court should deny Tiger's motion because Tiger seeks equitable relief with unclean hands. *See Frad v. Columbian Nat'l Life Ins. Co.*, 191 F.2d 22, 26 (2d Cir. 1951) ("It is a fundamental rule that one who comes into equity must do so with clean hands.") (citations omitted); *Clinton E. Worden & Co. v. California Fig Syrup Co.*, 187 U.S. 516, 528 (1903) (reversing the grant of a preliminary injunction in trademark case because plaintiff had engaged in false and misleading representations). While loudly crying foul over WhenU's contextually relevant advertising, Tiger is stone silent with respect to its own advertising.

Tiger cannot seek equitable relief to stop competitive practices in which it also engages. *See, e.g., Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1380 (N.D. Ga. 2001) (denying injunctive relief where plaintiff engaged in same competitive conduct it sought to enjoin). Just last year, Tiger ran an advertising campaign in which its pop-up ads were displayed to consumers viewing its competitors' websites, including Dell. (Gaeta Aff. Ex. A.) Though WhenU is confident that its contextual marketing is legitimate, Tiger should not be permitted to take one position when it comes to its competitors and another with respect to its own actions. The Court should, therefore, deny Tiger's motion on this basic principle of equity.

### B. Tiger Cannot Show Irreparable Harm and The Balance of Harm Weighs in WhenU's Favor.

Tiger will not suffer irreparable harm because WhenU has altered its technology to cease the complained of activities from occurring until this litigation is resolved. Thus, a preliminary injunction is inappropriate because WhenU has taken affirmative steps to prevent offers from appearing when WhenU's technology discerns that consumers are accessing Tiger's website. See,

9

*e.g., Computer Currents Publ'g Corp. v. Jaye Communications, Inc.*, 968 F. Supp. 684, 689 (N.D. Ga. 1997)(denying preliminary injunctive relief where defendant had taken steps to reduce harm to plaintiff); *Snair v. City of Clearwater*, 787 F. Supp. 1401, 1415 (M.D. Fla. 1992)(same). As the purpose of a preliminary injunction is to prevent future conduct, and not to punish past conduct, the Court should deny Tiger's request out of hand. *In the Matter of Helinger*, 22 B.R. 139 142, 143 (M.D. Fla. 1982) (denying preliminary relief on grounds that past infringement was "insufficient basis to conclude that he will do so in the future unless enjoined").

In marked contrast to Tiger, WhenU will suffer substantial harm if an injunction issues. Without the benefit of discovery or a full trial, a preliminary injunction would effectively damn WhenU's business model, threaten WhenU's relationships with its current advertisers and inhibit WhenU's ability to obtain new advertisers. (Naider Aff. ¶¶¶¶ 50-52.) Thus, WhenU will suffer significant and irreparable consequences if an injunction issues, while Tiger faces no threat of harm if the Court denies its motion.

### C. Laches Shows Absence of Irreparable Harm.

Tiger's undue delay in seeking preliminary injunctive relief is yet another reason to deny the motion. From the time it became aware of the ads, Tiger waited eight months before filing the Complaint and a year before filing this motion.[4] Courts have regarded such significant delay as an indication that the plaintiff will not suffer irreparable harm. *See, e.g., Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002) (denying preliminary relief where complaint filed one year after notice of defendant's activities); *Comedy Hall of Fame, Inc. v. George Schlatter Prods., Inc.*, 874 F. Supp. 378, 383 (M.D. Fla. 1994) (denying preliminary relief where "[p]laintiff failed to assert any alleged rights for more than a year after it discovered" defendant's use of the mark).

Even if Tiger had not waited so long to request this relief, and even if WhenU had not

---

[4] Tiger claims that it first became aware of WhenU's ads in March of 2002 (Tiger's Mem. at 11), yet waited until October 2002 to send WhenU a cease and desist letter (Tiger's Mem. at 2) (which WhenU never received, see Naider Aff. ¶¶ 54), until November 2002 to file its Complaint, and until March 14, 2003 to file the instant motion.

voluntarily altered its technology to prevent the complained of activity, the injunction requested by Tiger would be inapposite; the ads and coupons depicted in Tiger's brief are no longer even in use. (Naider Aff. ¶¶ 48.) All current WhenU ads and coupons contain on their face clear notice that the ads are not affiliated with any website that the consumer is viewing, and the formats of some offers attached to Tiger's brief are no longer offered by WhenU. (Naider Aff. ¶¶ 42, 48.) Thus, the facts and circumstances pursuant to which Tiger is asking this Court to render a decision are not an accurate reflection of WhenU's current advertising practices. Tiger's motion is simply stale due to its undue delay in seeking preliminary relief.

### D. The Court Should Not Apply A Presumption of Harm.

Recognizing that evidence of its irreparable harm pales in comparison to the harm that WhenU would suffer from an injunction, Tiger relies entirely on a "presumption of irreparable harm" that is inapplicable here.[5] (Tiger Mem. at 13-14.) Courts do not mechanically apply a presumption of harm just because a plaintiff has alleged trademark infringement. *See Caruso*, 994 F. Supp. at 1464-65 (questioning whether presumption applies); *Solar Cosmetics Labs, Inc. v. Sun-Fun Prods., Inc.*, 941 F. Supp. 1185, 1189 (M.D. Fla. 1996)(noting that a presumption is not automatically applied in trademark cases). A presumption may apply only after the plaintiff has shown a substantial likelihood of consumer confusion. *Solar*, 941 F. Supp. at 1188 (citations omitted). As discussed in detail below, Tiger cannot establish a prima facie case of confusion, let alone a substantial likelihood of confusion. Thus, Tiger carries the burden of establishing all four elements necessary for a preliminary injunction. *Universal City Studios, Inc. v. Casey & Casey, Inc.*, 622 F. Supp. 201, 203 (S.D. Fla. 1985), *aff'd*, 792 F.2d 1125 (11th Cir. 1986) (denying preliminary injunction and imposing burden on movant to establish all four elements if no showing of a prima facie case of trademark infringement). Tiger has failed to meet this burden.

---

[5] Tiger inexplicably discusses the presumption courts sometimes afford in copyright cases (Tiger Mem. at 13), although it does not even allege copyright infringement in its Complaint.

**VIII. Tiger Is Not Likely To Succeed On The Merits Of Its Claims.**

### A. Tiger Is Not Likely To Prevail On Its Federal Trademark Infringement, Federal Unfair Competition Or Common Law Unfair Competition Claims.

WhenU's ads, offers and coupons do not constitute trademark infringement or unfair competition under federal or state law for two independent reasons: (1) WhenU does not make any unlawful use of Tiger's trademarks; and (2) WhenU's ads, offers and coupons are not confusing.

### 1.  WhenU Is Not Using Tiger's Marks In Commerce.

A fundamental prerequisite for a trademark infringement or unfair competition claim under the Lanham Act or state common law is proof that the defendant is using the plaintiff's marks in commerce. 15 U.S.C. §§§§ 1114(1)(a), 1125(a); See *Dieter v. B&H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) ("In a trademark infringement action, the plaintiff must show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion."); *Immuno Vital, Inc. v. Golden Sun, Inc.*, 49 F. Supp. 2d 1344, 1350 (S.D. Fla. 1997) (requiring "use" of identical or similar trademark for common law unfair competition).

The Lanham Act provides that a mark is "use[d] in commerce" in connection with goods when it is actually placed on the goods or on the good's container, tag, label, display or associated paperwork. 15 U.S.C. §§ 1127 (emphasis added). A mark is "used" in connection with services when it is "used or displayed in the sale or advertising of services." Id. (emphasis added). In other words, for a mark to be "used" in commerce, as defined in the Lanham Act, it must be advertised or promoted by the alleged infringer as a trademark. See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 361 (11th Cir. 1997), opinion modified on reh'g, 122 F.3d 1379 (11th Cir. 1997) (affirming holding that appearance of mark on a sign inside restaurant did not constitute "use" because the mark "was not being used to identify or distinguish the services being offered").

WhenU has never used any Tiger mark in any of its ads, and Tiger does not allege otherwise. (Naider Aff. ¶¶ 27.) Tiger's first theory for its claims is that its mark(s) may be visible at the same time as a WhenU ad. (Tiger Mem. at 16.) This contention is not true and, even if it

was, it fails to satisfy the Lanham Act's "use" requirement.

WhenU does not dispute that if a consumer had installed its SaveNow software, the software might have caused a WhenU ad to appear in a separate window at the same time as the consumer was viewing a Tiger webpage. This, however, is not use of a trademark -- "use" is not established merely because trademarks are simultaneously visible to a consumer. *See Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 683-84 (D. Md. 2001) (finding advertiser not liable for false designation of origin where defendant's ad was visible on a webpage that used plaintiff's mark as a domain name). To hold that simultaneous visibility alone constitutes use would be to hold that any time one trademark is seen at the same time as another, whether, for example, in the context of comparative advertising or because two billboards are placed next to each other, one mark would be "using" the other. This reading of the Lanham Act defies common sense.

WhenU's ads are really just a sophisticated form of comparative advertising, which does not violate trademark law, even when it does make use of a competitor's trademark. *See, e.g., August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995) (citations omitted) ("A use of a rival's mark that does not engender confusion about origin or quality is therefore permissible. . . . The use is not just permissible in the sense that one firm is entitled to do everything within legal bounds to undermine a rival; it is beneficial to consumers. They learn at a glance what kind of product is for sale and how it differs from a known benchmark."); *Diversified Mktg., Inc. v. Estee Lauder, Inc.*, 705 F. Supp. 128, 132 (S.D.N.Y. 1998) (finding the use of "If You Like ESTEE LAUDER * You'll Love BEAUTY USA" on product's packaging and point of sale advertising to be lawful comparative advertising). Just like in comparative advertising, visibility of the trademarks alone is not enough.[6]

Tiger's second theory for its claims - that WhenU's software "can only be used in

---

[6] The facts here are distinguishable from cases involving "framing" -- the appearance on a computer screen of one website, framed by a border containing the trademarks and content of another company's website such that the websites appear to be "integrated" into a "seamless" or "single visual presentation." See *Hard Rock Cafée Int'l (USA), Inc. v. Morton*, No. 97 Civ. 9483, 1999 WL 717995, at *25 (S.D.N.Y. Sept. 9, 1999). Here, WhenU's ads appear in a separate and independent window that bears no physical relationship to the browser window containing Tiger's website. (Naider Aff. ¶¶ 44.)

connection with a successful host website" (Tiger Mem. at 16) and that WhenU "specifically targets" Tiger's website (Paul Aff. ¶¶ 26) - is also not supported by the facts or the law. As a factual matter, WhenU does not guarantee an advertiser that its ads will appear when consumers visit a particular website or webpage. (Naider Aff. ¶¶ 30.) Instead, WhenU directs its advertising to categories of consumer interest. (Naider Aff. ¶¶ 26-27.) The SaveNow proprietary directory contains a vast number of search terms, key words, and other "triggers" that generate ads and coupons at appropriate times. (Naider Aff. ¶¶ 25.)

WhenU's use of Tiger's URL and/or the name "TigerDirect" as a component of its proprietary directory to index Tiger's website does not amount to an infringing use of Tiger's trademark. *Cf. Fare Deals*, 180 F. Supp. 2d at 684 ("A defendant cannot have used an infringing mark when it played no role in the act of placing the mark in commerce."); *see also DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 938-39 (8th Cir. 2003)(affirming finding that although defendant profited from its toll free number incorporating the plaintiff's trademark, the defendant's acts did not satisfy Lanham Act use requirement because there was no evidence that it advertised or promoted the telephone number in commerce). Even if WhenU incorporates Tiger's web address or other identifying information into its directory as one indicator of consumer interest in a computer or other purchase, WhenU's ads not in any way promote Tiger's web address or any of Tiger's trademarks. Consumers never see the contents of the directory. Thus, there is no basis for Tiger's claim of trademark infringement or unfair competition because WhenU is not using Tiger's trademarks as trademarks.[7]

**2.  Tiger Has Not Met Its Burden of Establishing A Likelihood of Confusion.**

Tiger's passing reference to the Eleventh Circuit's likelihood of confusion test fails to cure

---

[7] This case is distinguishable from those involving metatags because WhenU does not divert consumers from one website to another. See *Playboy Enters. Inc. v. Netscape Communications Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999), aff'd, 202 F.3d 278 (9th Cir. 1999) (denying preliminary injunction where trademark infringement was premised on search engine's use of trademarked terms as triggers for competitive ads). Here, Tiger's website is plainly visible when WhenU's ads appear. (Naider Aff. ¶¶ 44.) Consumers only access a different website if they affirmatively click on the WhenU ad. (Naider Aff. ¶¶ 45.) Otherwise, they simply close the WhenU ad, by clicking on the "X," and continue to interact with Tiger's website. (Naider Aff. ¶¶ 46.)

the basic flaw in its trademark infringement and unfair competition claims -- WhenU does not use a Tiger mark, as use is proscribed under the Lanham Act. *See supra* Section. II.A.1. Perhaps recognizing the fatal flaws in its argument, Tiger provides no analysis of six of the seven likelihood of confusion factors. *See Lone Star*, 122 F.3d at 1382 (listing seven factors a district court must analyze to determine likelihood of confusion). Instead, Tiger summarily applies a few of the factors, and then focuses on the actual confusion prong. (Tiger Mem. at 17.) Tiger's argument, however, is unsupported by the facts.

While evidence of actual confusion is relevant to a likelihood of confusion analysis, Tiger has not presented a single, concrete example of actual consumer confusion. Tiger merely claims that "dozens of consumers" have called regarding the ads. (Paul Aff. ¶¶ 26.) A bald assertion in a self-serving affidavit surely cannot provide evidence of actual confusion or the sole basis for a finding of likelihood of confusion as suggested by Tiger.

Moreover, the factual circumstances have changed since Tiger filed its Complaint; WhenU's ads and coupons are different now than those pictured in Tiger's moving papers. All of WhenU's ads and coupons are clearly marked with the "$ SaveNow" or Save! and bull's eye designations. (Naider Aff. ¶¶ 42.) Furthermore, all SaveNow ads and coupons plainly state: "This is a WhenU offer and is not sponsored or displayed by the websites you are visiting." (Naider Aff. ¶¶ 42.) Thus, the offers pictured in Tiger's papers simply do not exist anymore. In light of this evidence, Tiger cannot demonstrate that consumers are likely to be confused into believing that a WhenU ad is affiliated with or authorized by Tiger such that they will purchase the products or services offered in the WhenU ad believing that they are the products or services of Tiger instead. This, of course, is particularly true since WhenU is not - and for four months has not been - showing SaveNow offers to consumers who are viewing Tiger's website.

## B. Tiger is Not Likely to Prevail on Its Dilution Claim.

To establish a likelihood of success on its claim for dilution, Tiger must show that (1) its marks are famous and distinctive; (2) WhenU is making commercial use of the marks in commerce; (3) WhenU's use began after Tiger's marks became famous; and (4) WhenU's use of Tiger's marks dilutes the quality of the marks by diminishing the capacity of Tiger's marks to

identify and distinguish its goods and services. 15 U.S.C. §§ 1125(c)(1); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1269 (S.D. Fla. 1999). As discussed above, Tiger cannot show that WhenU is using the Tiger marks in commerce. Tiger is also unlikely to succeed on the merits of its claim because a showing of fame is central to dilution.

To show fame, Tiger must show that its marks enjoy more than just inherent or acquired distinctiveness - "[r]ather to be capable of being diluted, a mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark." *Carnival*, 74 F. Supp. 2d at 1270 (internal quotations and citations omitted). Courts in this district recognize that a famous mark is one that is "truly prominent and renowned." Id. (internal quotations and citations omitted) (finding the mark "FUN SHIP" was not famous despite extensive advertising and sales); *see also Caruso*, 994 F. Supp. at 1463 (denying preliminary injunction even though the plaintiff had extensively advertised its registered mark in certain markets). Tiger's marks do not rise to the required level of fame.

Moreover, even if it could establish fame, Tiger offers no evidence of actual dilution, a prerequisite for a dilution claim. *Moseley v. V Secret Catalogue, Inc.*, 123 S. Ct. 1115, 1124 (2003). Thus, Tiger is unlikely to prevail on its dilution claim.

### C. Tiger s Not Likely to Prevail On Its Interference With Prospective Economic Advantage Claim.

Tiger is unlikely to demonstrate the four elements needed for this common law claim; namely, (1) the existence of a business relationship, (2) WhenU's knowledge of that relationship, (3) WhenU's intentional and unjustified interference with that relationship, and (4) damage to Tiger as a result of breach of the relationship. *Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1286 (M.D. Fla. 2002) (dismissing claim).

For the first element, there must be "an actual, identifiable understanding or agreement, which in all probability would have been completed if the defendant had not interfered." *Id.* Contrary to Tiger's assertions, "visitors" to its website do not qualify as a business relationship for this tort. Indeed, in *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994), a case relied upon by Tiger, the Florida Supreme Court found that a business relationship

16

did not exist where it was based on speculation. The Court further noted that an offer to sell

"'does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference

with a business relationship.'" Id. at 814 (quoting *Landry v. Hornstein*, 462 So. 2d 844, 846 (Fla.

Dist. Ct. App. 1985)). By visiting a website, a consumer does not enter into an "actual,

identifiable understanding or agreement" with the website owner. Equally tenuous, is the notion

that the Internet consumer would have made a purchase but for the appearance of the WhenU

offer.

Moreover, "Florida recognizes competition between competitors, and if there is an

interference with a non-exclusive right this is a privileged interference." *Jay v. Mobley*, 783 So. 2d

297, 299 (Fla. Dist. Ct. App. 2001), *review denied*, 800 So. 2d 614 (Fla. 2001) (citations and

quotations omitted) (dismissing claim because, as a competitor of the plaintiff, the defendant "was

entitled to approach [the consumer] with a competing offer to buy the property, where there was

at most only a prospective contractual relationship"). WhenU's business model is premised on this

principle - informing consumers of better deals for the same products at competitive websites.

Thus, Tiger's claim has no merit.

### D. Tiger is Not Likely to Prevail on Its Unjust Enrichment Claim.

Tiger is not likely to succeed on the merits of its unjust enrichment claim under federal or

state law. Under the Lanham Act, a district court has the discretion, based on the equities of the

case, to award profits if the infringement is willful. See 15 U.S.C. §§ 1117. As more fully

discussed in Section II.A.1. above, among other reasons, Tiger cannot demonstrate willful

infringement under the Lanham Act because WhenU has not made any unlawful use of Tiger's

trademarks, thereby vitiating its ability to assert a federal unjust enrichment claim.

Likewise, Tiger cannot sustain a claim for unjust enrichment under Florida law. For this

claim, Tiger must prove that: "(1) the plaintiff has conferred a benefit on the defendant, who has

knowledge thereof; (2) the defendant has voluntarily accepted and retained the benefit conferred;

and (3) the circumstances are such that it would be inequitable for the defendant to retain the

benefit without paying the value thereof to the plaintiff." *Tooltrend, Inc. v. CMT Utensili, SRL,*

17

198 F.3d 802, 805 (11th Cir. 1999).[8] Under Florida law, it is axiomatic that there must be a benefit conferred by the plaintiff before unjust enrichment exists. See *Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982) (reversing judgment because the plaintiff did not confer a benefit upon the defendant). While Tiger sets forth unsubstantiated allegations relating to WhenU's services, these claims do not support a finding that Tiger has conferred a benefit upon WhenU for which it should be compensated. See Tooltrend, 198 F.3d at 805 (holding that defendant's profits were incidental to plaintiff's activities and could not sustain unjust enrichment claim).

**IX. A Preliminary Injunction Will Harm The Public Interest.**

As Tiger cannot demonstrate that consumer confusion is likely, an injunction will not serve the public interest. *Caruso*, 994 F. Supp. at 1465. Indeed, an injunction will disserve the public interest because WhenU's business practices enable Internet consumers to make informed purchases. Without WhenU's offers, a consumer may be unaware that a better deal is only one click away. As WhenU is on the cutting edge of an emerging industry that fosters online competition, consumers will ultimately suffer harm if this Court enters the requested injunction.

**CONCLUSION**

As Tiger cannot establish the required elements for a preliminary injunction, and Tiger comes to Court with unclean hands, Tiger's request for extraordinary relief should be denied.

---

[8] In *Tooltrend*, the only case Tiger has cited in support of this claim, the Eleventh Circuit affirmed the district court's judgment as a matter of law that the plaintiff failed to prove its unjust enrichment claim. *Tooltrend*, 198 F.3d at 808.

18

Respectfully Submitted,

Moscowitz Moscowitz & Magolnick, P.A.
Mellon Financial Center
1111 Brickell Avenue, Suite 2050
Miami, FL 33131
Telephone (305) 379-8300
Facsimile (305) 379-4404

DATED: April 7, 2003                    BY: _____
                                        Jane W. Moscowitz, Esquire
                                        Florida Bar No. 586498
                                        jmoscowitz@mmmpa.com


Of Counsel

Nels T. Lippert, Esq.                   Arnold P. Lusker, Esq.
Dyan Finguera-DuCharme. Esq.            Carl H. Settlemeyer III, Esq.
Jennifer A. Gaeta, Esq.                 Maureen Cohn Harrington, Esq.
Hale and Dorr LLP                       Lutzker & Lutzker LLP
300 Park Avenue                         1000 Vermont Avenue, N.W., Suite 430
New York, New York 10022                Washington, D.C. 20005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via hand-delivery this _8_ day of April, 2003, on Jennifer G. Altman, Esq., Boies Schiller & Flexner, Bank of America Tower, 100 S.E. 2nd Street, Suite 2800, Miami, FL 33131-2144.

Jane W. Moscowitz